MANATT, PHELPS & PHILLIPS, LLP
ROBERT H. PLATT (Bar No. 108533)
Email: rplatt@manatt.com
DONALD R. BROWN (Bar No. 156548)
Email: dbrown@manatt.com
CONNIE LAM (Bar No. 301535)
Email: clam@manatt.com
11355 West Olympic Boulevard
Los Angeles, California 90064-1614
Telephone: (310) 312-4000
Facsimile: (310) 312-4224

MANATT, PHELPS & PHILLIPS, LLP
CHRISTOPHER A. RHEINHEIMER (Bar No. 253890)
Email: crheinheimer@manatt.com
One Embarcadero Center, 30th Floor
San Francisco, CA 94111
Telephone: (415) 291-7400
Facsimile: (415) 291-7474

Attorneys for *Defendant*
TINDER, INC.

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BILLY WARNER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>TINDER, INC.,<br><br>Defendant. | Case No.: 2:15-cv-01668-MMM-AJW<br><br><u>Hon. Margaret M. Morrow</u><br><br>**TINDER, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT;**<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>[Filed concurrently with<br>1. Request for Judicial Notice;<br>2. Declaration of Artem Tarkhanyan;<br>3. [Proposed] Order]<br><br>Hearing Date: August 3, 2015<br>Hearing Time: 10:00 a.m.<br>Courtroom: 780<br><br>Action filed: March 6, 2015 |

PLEASE TAKE NOTICE that on August 3, 2015, at 10:00 a.m. in Courtroom 780, defendant Tinder, Inc. will and hereby does move this Court under Federal Rule of Civil Procedure 12(b)(6) for an order dismissing each cause of action of plaintiff Billy Warner's Second Amended Complaint. In addition, Defendant moves, in the alternative as to the second and third causes of action, for an order compelling Plaintiff to join Apple Inc. as an indispensable party under Rule 12(b)(7), and if Apple Inc. is not joined, dismissing the second and third causes of action on that basis. This Motion is brought on the following grounds:

Plaintiff's first cause of action under California's Unruh Civil Rights Act fails to state a claim for relief because Defendant's alleged age-based pricing is not unlawfully discriminatory. Moreover, the Unruh Act does not apply because the discrimination is alleged to have occurred outside of California.

Plaintiff's second cause of action under the federal Electronic Funds Transfer Act and third cause of action under the California Automatic Purchase Renewal Statute fail to state claims for relief because the Tinder Plus subscription process at issue in this case complied with those statutes. Also, Plaintiff, a non-California resident, lacks standing to enforce the California statute. In addition, Plaintiff has failed to join an indispensable party, Apple Inc.

Plaintiff's fourth cause of action under California's False Advertising Law and fifth cause of action under California's Unfair Competition Law fail to state claims for relief because the gravamen of those claims—that it was wrongful for Defendant to offer an enhanced version of its free app that would require payment of a fee—is not cognizable under either statute.

This Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the concurrently-filed Request for Judicial Notice, the concurrently-filed Declaration of Artem Tarkhanyan, all papers on file with the Court, and all evidence and argument presented at or before the hearing on this motion.

This Motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on May 13, 2015.

Dated: May 20, 2015

MANATT, PHELPS & PHILLIPS, LLP

By: /s/ Robert H. Platt
Robert H. Platt
Attorneys for *Defendant*
TINDER, INC.

# TABLE OF CONTENTS


| | | | | Page |
|---|---|---|---|---|
| I. | INTRODUCTION | | | 1 |
| II. | STATEMENT OF ALLEGED FACTS | | | 2 |
| | A. | The Tinder App | | 2 |
| | B. | Plaintiff Downloaded the Free Tinder App and Now Complains That Premium Features Are Available for a Fee | | 3 |
| | C. | Plaintiff Alleges He Was Not Informed of Recurring Charges for Tinder Plus, But Actual Screen Pages Prove Otherwise | | 4 |
| | D. | The Tinder Plus Price Allegedly Was Discriminatory and Was Changed "Unilaterally." | | 5 |
| III. | ARGUMENT | | | 5 |
| | A. | Legal Standard for Motion to Dismiss | | 5 |
| | B. | The FAL and UCL Claims Fail | | 6 |
| | | 1. | Plaintiff Does Not Allege Any Misrepresentation by Defendant That Was Likely to Deceive the Public | 6 |
| | | 2. | Plaintiff Does Not Allege Any Cognizable Injury | 8 |
| | | 3. | Plaintiff Fails to State a Claim under the UCL's "Unfair" Prong | 9 |
| | | 4. | Plaintiff Fails to State a Claim under the UCL's "Unlawful" Prong | 11 |
| | C. | The Tinder Plus Automatic Renewal Process Does Not Violate the EFTA or the APRS | | 12 |
| | | 1. | The Tinder Plus Subscription Process Satisfies the EFTA | 12 |
| | | 2. | The APRS Only Protects California Consumers | 13 |
| | | 3. | The Tinder Plus Subscription Process Satisfies the APRS | 14 |
| | | 4. | Plaintiff Failed to Join an Indispensable Defendant for the EFTA and APRS Claims | 15 |
| | D. | Plaintiff Fails to State a Claim for Violation of the Unruh Act | | 16 |
| | | 1. | The Unruh Act Does Not Apply Because Plaintiff Does Not Allege Any Unlawful Discrimination within California | 16 |
| | | 2. | Pricing for Tinder Plus Does Not Violate the Unruh Act | 17 |
| IV. | CONCLUSION | | | 19 |

# TABLE OF AUTHORITIES

Page

## CASES

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 6, 18

*Baggett v. Hewlett-Packard Co.*,
2009 WL 3178066 (C.D. Cal. Sept. 29, 2009) .......... 9

*Balistreri v. Pacifica Police Dep't*,
901 F.2d 696 (9th Cir. 1990) .......... 5

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 6

*Berry v. Webloyalty.com, Inc.*,
2011 WL 1375665 (S.D. Cal. Apr. 11, 2011) .......... 12, 13

*Buckland v. Threshold Enters., Ltd.*,
155 Cal. App. 4th 798 (2007) .......... 8

*Casault v. Fed. Nat'l Mortg. Ass'n*,
915 F. Supp. 2d 1113 (C.D. Cal. 2012) .......... 11

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
20 Cal. 4th 163 (1999) .......... 10

*Citizens of Humanity, LLC v. Costco Wholesale Corp.*,
171 Cal. App. 4th 1 (2009) .......... 8

*Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv., Inc.*,
911 F.2d 242 (9th Cir. 1990) .......... 19

*Cunningham v. Municipality of Metro. Seattle*,
751 F. Supp. 885 (W.D. Wash. 1990) .......... 16

*Davis v. Ford Motor Credit Co.*,
179 Cal. App. 4th 581 (2009) .......... 10

*Davis v. HSBC Bank Nevada, N.A.*,
691 F.3d 1152, 1170 (9th Cir. 2012) .......... 10

*Durell v. Sharp Healthcare*,
183 Cal. App. 4th 1350 (2010) .......... 9

*Freeman v. Time, Inc.*,
68 F.3d 285 (9th Cir. 1995) .......... 6

# TABLE OF AUTHORITIES
## (continued)


Page

*Hall v. Time, Inc.*,
158 Cal. App. 4th 847 (2008) ... 9

*HS Resources, Inc. v. Wingate*,
327 F.3d 432 (5th Cir. 2003) ... 15

*I.B. v. Facebook, Inc.*,
905 F. Supp. 2d 989 (N.D. Cal. 2012) ... 10

*In re Vioxx Class Cases*,
180 Cal. App. 4th 116 (2009) ... 8

*Ingels v. Westwood One Broad. Servs., Inc.*,
129 Cal. App. 4th 1050 (2005) ... 11

*Keum v. Virgin Am. Inc.*,
781 F. Supp. 2d 944 (N.D. Cal. 2011) ... 16

*Konik v. Time Warner Cable*,
2010 WL 8471923 (C.D. Cal. 2010) ... 9

*Lavie v. Procter & Gamble Co.*,
105 Cal. App. 4th 496 (2003) ... 6

*Lazar v. Hertz Corp.*,
69 Cal. App. 4th 1494 (1999) ... 17

*Loving v. Princess Cruise Lines, Ltd.*,
2009 WL 7236419 (C.D. Cal. Mar. 5, 2009) ... 16

*Lozano v. AT&T Wireless Servs.*,
504 F.3d 718, 736 (9th Cir. 2007) ... 10

*Martinez v. Wells Fargo Home Mortg., Inc.*,
598 F.3d 549 (9th Cir. 2010) ... 11

*Medina v. Safe-Guard Prods. Int'l, Inc.*,
164 Cal. App. 4th 105 (2008) ... 9

*Meyer v. National Tenant Network*,
10 F. Supp. 3d 1096, 1099 (N.D. Cal. 2014) ... 6

*New Net, Inc. v. Lavasoft*,
356 F. Supp. 2d 1090 (C.D. Cal. 2004) ... 6

*Noll v. eBay, Inc.*,
2013 WL 2384250 (N.D. Cal. May 30, 2013) ... 14

## TABLE OF AUTHORITIES
## (continued)

Page

*O'Connor v. Village Green Owners Assoc.*, 33 Cal. 3d 790 (1983) .......... 18

*Pantoja v. Countrywide Home Loans, Inc.*, 640 F. Supp. 2d 1177 (N.D. Cal. 2009) .......... 11

*Park v. Webloyalty.com, Inc.*, 2014 WL 4829465 (S.D. Cal. Sept. 29, 2014) .......... 13

*Peterson v. Cellco Partnership*, 164 Cal. App. 4th 1583 (2008) .......... 9

*Pizarro v. Lamb's Players Theater*, 135 Cal. App. 4th 1171 (2006) .......... 17, 19

*Sargoy v. Resolution Trust Corp.*, 8 Cal. App. 4th 1039 (1992) .......... 17, 18

*Sousanis v. Northwest Airlines, Inc.*, 2000 WL 34015861 (N.D. Cal. Mar. 3, 2000) .......... 16

*South Bay Chevrolet v. General Motors Acceptance Corp.*, 72 Cal. App. 4th 861 (1999) .......... 10, 11

*Starkman v. Mann Theatres Corp.*, 227 Cal. App. 3d 1491 (1991) .......... 17, 18, 19

*Taragan v. Nissan North Am., Inc.*, 2013 WL 3157918 (N.D. Cal. June 20, 2013) .......... 11

## STATUTES

15 U.S.C. § 1693e(a) .......... 12

15 U.S.C. § 7006(5) .......... 12

Cal. Bus. & Prof. Code § 17601(b) .......... 14

Cal. Bus. & Prof. Code § 17601(b)(1) .......... 14

Cal. Bus. & Prof. Code § 17601(b)(2) .......... 15

Cal. Bus. & Prof. Code § 17601(b)(3) .......... 14

Cal. Bus. & Prof. Code § 17601(b)(4) .......... 15

Cal. Bus. & Prof. Code § 17601(b)(5) .......... 15

Cal. Bus. & Prof. Code § 17602(a) .......... 14

## TABLE OF AUTHORITIES
## (continued)


**Page**

Cal. Civ. Code § 51(b) ........................................ 16

**OTHER AUTHORITIES**

12 C.F.R. § 1005.2(k) ........................................ 12

**RULES**

Fed. R. Civ. Proc. 9(b) ........................................ 8

Fed. R. Civ. Proc. 12(b)(6) ........................................ 1, 5, 6

Fed. R. Civ. Proc. 12(b)(7) ........................................ 15

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Defendant offers the free dating app Tinder for use on mobile phones. Defendant recently released a set of premium features, called Tinder Plus, that can be added to the underlying free service for a monthly fee. Plaintiff, apparently unhappy about the prospect of paying for premium features (though the underlying service is still free), has commenced a putative nationwide class action based on the novel premise that, having initially offered a free app, Defendant may never charge a fee for any version or feature of the app.

Plaintiff claims that by adding premium features and releasing Tinder Plus for a monthly fee, Defendant is violating California's False Advertising Law and Unfair Competition Law. He alleges that he would have "reconsidered" his original decision to download and use the Tinder app for free if he had known that Defendant might someday add premium features and make them available for a fee. But there is no basis for Plaintiff's apparent assumption that he would have unlimited free access to every feature of the Tinder app forever. Plaintiff does not allege that Defendant promised or in any way represented to its users that they would have perpetual free access to every feature (current or future) of the app. Nor does Plaintiff allege any cognizable harm from having used the free app or having chosen to pay for the Tinder Plus features. These claims, which formed the sole basis of Plaintiff's original Complaint, fail under Rule 12(b)(6).

The additional claims in Plaintiff's Second Amended Complaint ("SAC") are also deficient. Plaintiff now claims that when he subscribed to Tinder Plus, he did not receive disclosures mandated by the federal Electronic Funds Transfer Act and California's Automatic Purchase Renewal Statute regarding recurring charges and the right to cancel. To the contrary, screen shots of the Tinder Plus subscription process that are subject to judicial notice demonstrate that the terms of the offer, including the right to cancel the automatic renewal, were fully disclosed in

accordance with both statutes. In any event, Plaintiff is a Florida resident and thus has no standing to enforce the California statute.[1]

Plaintiff's other new claim is that Defendant is violating California's Unruh Civil Rights Act by providing a youth (under 30) discount for Tinder Plus. Plaintiff's Florida residency dooms this claim as well, because the protections of the Unruh Act are expressly limited to "persons within the jurisdiction." Even if Plaintiff had alleged discrimination within California, however, this claim would still fail. The Unruh Act only prohibits discrimination that is "arbitrary, invidious or unreasonable." No California court has ever found age-based distinctions to be unlawful under this statute except in the context of housing, whereas commonplace price distinctions based on age have survived challenges in contexts ranging from theater and movie tickets to savings accounts to car rentals.

## II. STATEMENT OF ALLEGED FACTS[2]

### A. The Tinder App

Defendant offers a free dating app for mobile phones called Tinder. (SAC ¶17.) When a user registers for the Tinder service, information from the user's Facebook account is used to populate his or her Tinder profile. (SAC ¶ 18.) Using search parameters established by its users and the GPS technology on their mobile phones, the app locates and presents the profiles of other Tinder users in the same geographic locale. (SAC ¶ 19.) The user "swipes" left or right on the phone's touchscreen to either reject or accept ("like") the profiles presented. (SAC ¶ 20.) If two users both swipe right on each other's profiles, they can communicate through Tinder and determine whether they would like to meet in person. (*Id.*)[3]

---

[1] In addition, Plaintiff has failed to name an indispensable party. Apple, rather than Defendant, controls several steps in the subscription process.

[2] This section also discusses documents as to which Defendant is requesting judicial notice.

[3] In the SAC, Plaintiff reversed the meaning of a left vs. a right swipe, alleging that a left swipe is a "like." The error is not material to this motion.

### B. Plaintiff Downloaded the Free Tinder App and Now Complains That Premium Features Are Available for a Fee.

Plaintiff alleges that in early 2014, he downloaded the free Tinder app via iTunes onto his iPhone. (SAC ¶ 16.) The app was advertised as "free" (SAC ¶¶ 21-24), and when Plaintiff downloaded the app, he expected to be able to use it "for the foreseeable future" without charge (SAC ¶¶ 25-31).[4] He alleges that Defendant never "warned" users of the possibility that someday a fee may be required to use any aspect of the app. (SAC ¶¶ 26, 31.)

According to Plaintiff, "[f]ollowing years of benefiting from Defendant's marketing, Defendant abruptly began informing consumers on or about March 2, 2015, that consumers would no longer be able to utilize Tinder for the functions which consumers had previously enjoyed free use." (SAC ¶ 34.) Plaintiff's specific gripe is that Defendant no longer permitted unlimited right swipes ("likes") unless the user purchased a Tinder Plus subscription. (SAC ¶¶ 36-43.)[5] Plaintiff therefore "reluctantly" paid $2.99 for Tinder Plus, claiming that the app was only of interest if he could continue to have an unlimited number of right swipes (i.e, indiscriminately indicate "likes," to which he became "addicted"). (SAC ¶¶ 43-46.)

Plaintiff does not allege (nor could he) that the release of Tinder Plus prevented him from continuing to use the free Tinder app. He simply alleges that continued access to unlimited right swipes was worth paying for, and so he paid. If he did not want to pay, he admittedly could have stopped using the app, as other consumers apparently did. (*See* SAC ¶¶ 51, 54.) Or, he could have continued to use the free Tinder service, but with limited right swipes.

---

4 Plaintiff is confused about the source of these ads. He cites, for example, an ad on apptinder.com that "Tinder is free and is available on iPhone and Android phones." (SAC ¶ 17.) Defendant's website is Tinder.com, not apptinder.com.

5 Tinder Plus also offers new features that were not previously available on the underlying free service—a fact that Plaintiff misleadingly omits from his complaint.

### C. Plaintiff Alleges He Was Not Informed of Recurring Charges for Tinder Plus, But Actual Screen Pages Prove Otherwise.

Plaintiff alleges that in subscribing to Tinder Plus he was enrolled in an automatic renewal program without his consent. (SAC ¶¶ 64-65.) This allegation is demonstrably false. The Tinder Plus subscription process, which is subject to judicial notice (*see* Request for Judicial Notice filed herewith), clearly and conspicuously discloses that subscribers will be charged a recurring monthly fee unless they cancel, and it provides clear instructions for how to cancel.

Paragraph 57 of the SAC contains a photo of the first screen in the Tinder Plus subscription process. A subscriber like Plaintiff who uses an iPhone must tap the "Get Plus" button on the screen (or alternatively, the "Get Unlimited Likes" button shown in SAC ¶ 41) and sign in to the iTunes Store in order to proceed. (Declaration of Artem Tarkhanyan in Support of Request for Judicial Notice ("Tarkhanyan Decl."), ¶¶ 3-5 and Ex. 1.) The subscriber is then asked to confirm his intent to subscribe to Tinder Plus for a clearly identified monthly price. (*Id.*, ¶ 6 and Ex. 2.) The subscriber is also informed that "[t]his subscription will automatically renew until canceled." (*Id.*) All of these disclosures are made prior to the purchase of the subscription.

As soon as the subscription is accepted, a new screen explains how to view the subscription settings and how to cancel the auto-renewal. (Tarkhanyan, ¶ 7 and Ex. 3.) Also, an email confirming the subscription purchase is sent to the email address provided by the subscriber. (*Id.*, ¶ 8 and Ex. 4.) The email discloses the date of purchase, subscription period, renewal price, and payment method. It also states: "The subscription period will automatically renew unless you turn it off no later than 24 hours before the end of the current period. To cancel auto-renewal or manage your subscriptions, click below and sign in." (*Id.*)

To view the subscription settings, the subscriber can tap the "Manage" button on Exhibit 3 or access the iTunes (technically, the App Store) manage-subscriptions

function at any time. A screen appears that explains the terms of the subscription and contains a simple toggle for turning off the auto-renewal. (Tarkhanyan Decl., ¶ 9 and Ex. 5.) When a subscriber turns off auto-renewal, his updated subscription page provides the date the subscription will terminate and explains how to renew the subscription in the future. (*Id.*, ¶¶ 10,11 and Exs. 6, 7.)

### D. The Tinder Plus Price Allegedly Was Discriminatory and Was Changed "Unilaterally."

Plaintiff alleges, confusingly, that after subscribing to Tinder Plus for $2.99 per month, he subscribed again for $19.99 per month (rather than renewing at the original $2.99 price).[6] (SAC ¶ 57.) He complains that Defendant failed to disclose that it "reserved the right to change its price at any time and in its sole discretion." (SAC ¶ 123.) Plaintiff does not, however, allege that Defendant actually changed the agreed-upon price for either of his subscriptions. He merely complains that the price was higher when (for whatever reason) he purchased a second subscription.

Plaintiff also complains that while he paid $19.99 for his second Tinder Plus subscription, users under age 30 allegedly received a 50% discount on that price. (SAC ¶ 76.) He claims that basing a price "solely upon [the customer's] age" is arbitrary (SAC ¶¶ 80, 82), yet he cites a media statement from Defendant explaining that, far from being arbitrary, Defendant's pricing model was thoroughly tested and is "based on a combination of factors" (SAC ¶ 79).

## III. ARGUMENT

### A. Legal Standard for Motion to Dismiss

Dismissal under Rule 12(b)(6) may be "based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A complaint cannot survive a Rule 12(b)(6) motion unless it "contain[s] sufficient

[6] The SAC does not state whether the second subscription was through the same account, or explain the circumstance of Plaintiff "restoring purchases" on his phone—as shown in the screen shot in SAC ¶ 57.

factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The "facial plausibility" standard mandates "more than a sheer possibility that a defendant has acted unlawfully." *Meyer v. National Tenant Network,* 10 F. Supp. 3d 1096, 1099 (N.D. Cal. 2014) (quoting *Iqbal,* 556 U.S. at 678).

In ruling on a motion under Rule 12(b)(6), a court may consider documents whose contents, while not expressly incorporated in the complaint, are "necessarily relied" upon by the complaint and whose authenticity is not subject to legitimate question. *New Net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1090, 1115-16 (C.D. Cal. 2004).

As discussed below, as a matter of law, the charging of a fee for Tinder Plus does not violate California's false advertising or unfair competition laws. Further, the subscription process provides all of the statutorily required disclosures, and the fees that Defendant charges for Tinder Plus are not unlawfully discriminatory.

**B. The FAL and UCL Claims Fail.**

**1. Plaintiff Does Not Allege Any Misrepresentation by Defendant That Was Likely to Deceive the Public.**

To state a claim under the FAL or under the "fraud" prong of the UCL, a plaintiff must credibly allege that members of the public were likely to be deceived by the advertisement or other representation in question. *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995). Deception is evaluated under a reasonable consumer standard. *Id.* "'Likely to deceive' implies more than a mere possibility that the advertisement might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner. Rather, the phrase indicates that the ad is such that it is probable that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 508 (2003).

Plaintiff alleges the following:

- "Plaintiff was informed, by various advertisements, promotions, and websites that [Defendant's] app was a 'free online dating app.' and [Defendant] 'holds itself out to be free on its own website, stating 'Tinder is free and is available on iPhone and Android phones.'" (SAC ¶ 21.)[7]
- "Tinder's advertisement and promotions through the iTunes store promotes [sic] Tinder as 'free' and states: '[t]o download the free app Tinder by Tinder, Inc., get iTunes now[,]' [as] well as that it is a 'free download.'" (SAC ¶ 22.)
- "Tinder is universally advertised as 'freeware' and 'free' software." (SAC ¶ 23.)

None of these alleged representations was false. Plaintiff admits that the Tinder app he downloaded and used for a year was free. (SAC ¶¶ 16, 25.)[8] And indeed, the basic Tinder app *remains* free to its users to this day. Moreover, no reasonable consumer would interpret any of the above-quoted ads or statements as a promise never in the future to charge a fee for prospective use of the app, much less never to charge for any particular functionality of the app or never to offer a premium version of the app for a fee. Significantly, Plaintiff does not allege or claim he saw any advertisements, promotions, or other statements by Defendant that it would never charge a fee for the Tinder app or any aspect or premium feature of the app.

Plaintiff's vague claim that he was deceived regarding the price for Tinder Plus is also unsupported. Plaintiff alleges that the monthly price was $2.99 for his first Tinder Plus subscription but $19.99 for his second subscription, and complains that Defendant "unilaterally changed the price." (SAC ¶ 122.) Plaintiff does not claim, however, that Defendant changed either price *during* the respective subscriptions. He is merely unhappy that his second subscription allegedly cost

[7] As noted previously, the website Plaintiff cites is not Defendant's.

[8] Plaintiff alleges that Defendant "deceive[d]" him into paying more for something he "reasonably believed [he] had already purchased" (SAC ¶ 120), but also admits that he never "purchased" the app in the first place (SAC ¶ 25).

more. There is nothing deceptive about raising or lowering the price of an offering.[9]

**2. Plaintiff Does Not Allege Any Cognizable Injury.**

Remedies under the UCL and the FAL are limited to restitution and injunctive relief. *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 130 (2009). Restitution requires proof that the plaintiff lost money or property as a result of the violation. *See Citizens of Humanity, LLC v. Costco Wholesale Corp.*, 171 Cal. App. 4th 1, 22 (2009) (plaintiff lacked standing to pursue UCL claim where alleged loss of goodwill was not compensable via restitution); *Buckland v. Threshold Enters., Ltd.*, 155 Cal. App. 4th 798, 817-819 (2007) (holding that UCL and FAL's "lost money or property" requirement "limit[s] standing to individuals who suffer losses of money or property that are eligible for restitution").

Plaintiff alleges that he "reasonably relied upon Defendant's representations regarding the Tinder App, namely that the Ignition App [sic][10] was downloaded free and clear, and would continue to provide unlimited swipes free of charge without any additional payment," and that he was injured because the app "turned out to be of significantly less value that what [he was] led to believe [he] had purchased ..." (SAC ¶ 121.) Plaintiff, however, did not "purchase" anything when he became a Tinder user. His download and use of a concededly free app cannot qualify as a "loss" of money or property for the obvious reason that the app was in fact free. (SAC ¶¶ 16, 21, 25.) Being given the option of paying a fee to maintain continued access to one feature (unlimited "likes") of the free app does not constitute a loss of money or property, particularly since Defendant was presumably free to eliminate that feature altogether. Indeed, Plaintiff does not even allege that he would not

[9] If Plaintiff actually means to allege that he agreed to one price but was charged another, he must make that allegation clear in accordance with Rule 9(b).

[10] This reference appears to be a relic from another complaint by Plaintiff's counsel.

have downloaded Tinder if he had known that a fee might someday be charged for access to unlimited "likes." He merely alleges that he may have "reconsidered" using the app. (SAC ¶ 31.)

Plaintiff also did not lose money or property by paying for Tinder Plus, because he received what he paid for. Plaintiff does not allege that Tinder Plus did not work as promised or was worth less than what he paid. Thus, even if the Court were to credit Plaintiff's novel theory of deception, Plaintiff still could not demonstrate a loss of money or property in connection with his purchase of Tinder Plus. *See, e.g., Hall v. Time, Inc.*, 158 Cal. App. 4th 847, 854-55 (2008) (no standing under UCL because, though plaintiff had "expended" money, he had not "lost" money: "He did not allege he did not want the book, the book was unsatisfactory, or the book was worth less than what he paid for it."); *Baggett v. Hewlett-Packard Co.*, 2009 WL 3178066, *3-4 (C.D. Cal. Sept. 29, 2009) (rejecting UCL claim where plaintiff could not establish that the loss was "unexpected" or "relatively unpredictable" because he received the product he paid for); *Medina v. Safe-Guard Prods. Int'l, Inc.*, 164 Cal. App. 4th 105, 114-15 (2008) (plaintiff lacked standing under UCL because he failed to allege that he paid more for the product than it was worth).

Because Plaintiff has suffered no injury-in-fact, he cannot recover under the FAL or the UCL. *See Konik v. Time Warner Cable*, 2010 WL 8471923 (C.D. Cal. 2010) (citing *Hall*, 158 Cal. App. 4th 847; *Medina*, 164 Cal. App. 4th 105; *Peterson v. Cellco Partnership*, 164 Cal. App. 4th 1583 (2008)).

### 3. Plaintiff Fails to State a Claim under the UCL's "Unfair" Prong.

The SAC also fails to state a claim for a violation of the UCL's "unfair" prong. UCL cases have applied a variety of tests for what constitutes an "unfair" business practice. *See Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1365 (2010). The SAC satisfies none of them.

The SAC cites the so-called FTC test (SAC ¶ 128), which is based on Section 5 of the Federal Trade Commission Act. This test, where it applies, requires proof that "(1) The consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoided." *Davis v. Ford Motor Credit Co.*, 179 Cal. App. 4th 581, 597 (2009). The Ninth Circuit, however, has expressly rejected this test. *See Lozano v. AT&T Wireless Servs.*, 504 F.3d 718, 736 (9th Cir. 2007) ("we decline to apply the FTC standard in the absence of a clear holding from the California Supreme Court"); *see also I.B. v. Facebook, Inc.*, 905 F. Supp. 2d 989, 1011 (N.D. Cal. 2012) (same). But even if the FTC test did apply, Plaintiff could not satisfy it because, among other reasons, use of a free dating app plainly does not implicate "substantial consumer injury."

Another test, the antitrust test, analyzes whether the conduct "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999). Plaintiff pleads nothing to satisfy this test. The SAC does not (and cannot) allege that the fees charged for Tinder Plus resulted in any kind antitrust violation or that Plaintiff's claim is tethered to a constitutional, statutory, or regulatory provision or policy in respect of competition. *See Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1170 (9th Cir. 2012) ("Davis advances no factual allegations to support the claim that the omission of the annual fee in Best Buy's advertisements threatens to violate the letter, policy, or spirit of the antitrust laws, or that it harms competition.").

A third test, the balancing test, examines whether the business practice is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *South Bay Chevrolet v. General Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 887 (1999). If the facts alleged meet these criteria, the court then

balances "the impact of the challenged practice on its alleged victim [] against the reasons, justifications and motives of the alleged wrongdoer." *Id.* at 886.

The challenged practice here—adding premium features to an existing free app for a separate fee—is obviously not immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, particularly inasmuch as the underlying service remains available for free. Also, the only "impact" on Plaintiff was that, at his election, he was charged a fee for the premium features. Courts have dismissed far more substantial claims under this rigorous test. *See, e.g., Taragan v. Nissan North Am., Inc.*, 2013 WL 3157918, *9 (N.D. Cal. June 20, 2013) (dismissing UCL claim alleging concealment of vehicle defect); *Casault v. Fed. Nat'l Mortg. Ass'n*, 915 F. Supp. 2d 1113, 1129 (C.D. Cal. 2012) (dismissing UCL claim alleging unlawful loan modification and foreclosure practices).

**4. Plaintiff Fails to State a Claim under the UCL's "Unlawful" Prong.**

Plaintiff's claim under the UCL's "unlawful" prong requires him to properly allege a violation of another law. *See Martinez v. Wells Fargo Home Mortg., Inc.*, 598 F.3d 549, 558 (9th Cir. 2010); *Ingels v. Westwood One Broad. Servs., Inc.*, 129 Cal. App. 4th 1050, 1060 (2005) ("A defendant cannot be liable under § 17200 for committing 'unlawful business practices' without having violated another law."). Thus, this claim survives only if Plaintiff can plead a viable claim under the FAL, the EFTA, the APRS, or the Unruh Act. (*See* SAC ¶¶ 144, 146.)

The FAL claim fails for reasons discussed above. The other claims fail for reasons discussed below. Therefore, Plaintiff's claim under this prong of the UCL also fails. *Pantoja v. Countrywide Home Loans, Inc.*, 640 F. Supp. 2d 1177, 1190 (N.D. Cal. 2009) ("In this case, since the Court has dismissed all of Plaintiff's predicate violations, Plaintiff cannot state a claim under the unlawful business practices prong of the UCL.").

### C. The Tinder Plus Automatic Renewal Process Does Not Violate the EFTA or the APRS.

Plaintiff's allegations that the Tinder Plus subscription process was deceptive and that it lacked disclosures required under the EFTA and the APRS incorporate by reference the steps required to complete the subscription process. The documents that demonstrate that process are therefore subject to judicial notice (as explained in Defendant's concurrent Request for Judicial Notice). Those documents conclusively refute these two claims.

#### 1. The Tinder Plus Subscription Process Satisfies the EFTA.

Pursuant to the EFTA, "[a] preauthorized electronic fund transfer from a consumer's account may be authorized by a consumer only in writing, and a copy of such authorization shall be provided to the consumer when made." 15 U.S.C. § 1693e(a). A "preauthorized electronic fund transfer" is defined as "an electronic fund transfer authorized in advance to recur at substantially regular intervals." 12 C.F.R. § 1005.2(k). "Written authorization" from the consumer can be provided electronically. *See Berry v. Webloyalty.com, Inc.*, 2011 WL 1375665, at *8 (S.D. Cal. Apr. 11, 2011) (citing 15 U.S.C. § 7006(5)).

Plaintiff allegedly purchased a Tinder Plus subscription for $2.99 per month and was auto-renewed for a second month. (SAC ¶¶ 56, 59.)[11] He claims this violated the EFTA in that he did not authorize the recurring charge (SAC ¶ 72) and he believed the $2.99 subscription had been canceled and superseded by his subsequent $19.99 subscription (SAC ¶ 71). Neither theory is viable.

The screen pages of the subscription process demonstrate that, after logging into his iTunes Store account (*see* Tarkhanyan Decl., Ex. 2), Plaintiff was presented with the following offer terms in plain English, including the terms regarding

---

[11] Plaintiff also subscribed separately for $19.99 but does not allege any unauthorized auto-debit for that subscription.

recurring charges: "Do you want to subscribe to Tinder Plus for 1 month for $19.99? This subscription will automatically renew until canceled." (Tarkhanyan Decl., Ex. 2.) By proceeding to subscribe, Plaintiff authorized the recurring charges, and was then sent an email confirming the subscription, including his authorization of the recurring charges. (*Id.*, Ex. 4.)

These simple facts compel dismissal of this claim. *See, e.g., Park v. Webloyalty.com, Inc.*, 2014 WL 4829465, at *4-*6 (S.D. Cal. Sept. 29, 2014) (dismissing EFTA claim because screenshots demonstrated no reasonable consumer would be deceived); *Berry v. Webloyalty.com, Inc.*, 2011 WL 1375665, at *7-*8 (S.D. Cal. Apr. 11, 2011) (dismissing EFTA claim after taking judicial notice of enrollment pages).[12]

Plaintiff's alternative theory—that his second subscription should have served as the cancellation of his first subscription—fails because this theory simply does not implicate the EFTA. The EFTA requires authorization for recurring charges; it does not require procedures designed to prevent a consumer from purchasing and maintaining two separate subscriptions. And even if the EFTA could somehow be construed to require a vendor to prevent multiple subscriptions through the same account, Plaintiff does not allege that he purchased both subscriptions through the same account or even through the same phone. Nor does he allege any representation by Defendant in the course of subscribing to the effect that a new subscription would automatically supersede an existing one.

**2. The APRS Only Protects California Consumers.**

Pursuant to the APRS, it "shall be unlawful for any business making an automatic renewal or continuous service offer to ***a consumer in this state***" to

[12] Even if the Court declines to take judicial notice of the Tinder Plus screenshots, the EFTA claim should still be dismissed because the SAC does not allege what process Plaintiff used to subscribe and, therefore, does not "plead[] facts that, if true, would show he is entitled to relief, and not merely that it is possible he is entitled to relief." *Park*, 2014 WL 4829465, at *5.

engage in the specified prohibited conduct. Cal. Bus. & Prof. Code § 17602(a) (emphasis added). "While the California Legislature has provided a private right of action for out-of-state consumers in other sections of the Business & Professions Code, it saw fit to do otherwise here. The Legislature employed specific language in Section 17602 limiting recovery under Section 17600 *et seq.* to California consumers." *Noll v. eBay, Inc.*, 2013 WL 2384250, at *6 (N.D. Cal. May 30, 2013) (granting motion to dismiss without leave to amend).

The SAC alleges that Plaintiff resides in Florida (SAC ¶ 10) and thus is not a "consumer in this state." The APRS claim therefore fails.

**3. The Tinder Plus Subscription Process Satisfies the APRS.**

Even if Plaintiff had standing under the APRS, his claim under that statute would still fail because the Tinder Plus disclosures satisfy the APRS requirements. Business and Professions Code section 17601(b) requires conspicuous disclosure of the following:

> (1) That the subscription or purchasing agreement will continue until the consumer cancels.
>
> (2) The description of the cancellation policy that applies to the offer.
>
> (3) The recurring charges that will be charged to the consumer's credit or debit card or payment account with a third party as part of the automatic renewal plan or arrangement, and that the amount of the charge may change, if that is the case, and the amount to which the charge will change, if known.
>
> (4) The length of the automatic renewal term or that the service is continuous, unless the length of the term is chosen by the consumer.
>
> (5) The minimum purchase obligation, if any.

All of those disclosures were clearly made here. Exhibit 2 clearly discloses: (a) that the subscription will continue until canceled by the consumer (§ 17601(b)(1)); (b) the amount of the recurring charges (§ 17601(b)(3)); and (c) the

length of the automatic renewal term (§ 17601(b)(4)). Furthermore, Exhibits 3, 4 and 5 collectively disclose the exceedingly simple cancellation policy in a clear and conspicuous fashion (§ 17601(b)(2)).[13] In addition, these exhibits provide links via both confirmation screen and confirmation email to the App Store location where the consumer can cancel the automatic renewal. The APRS requires nothing more.

#### 4. Plaintiff Failed to Join an Indispensable Defendant for the EFTA and APRS Claims.

Federal Rule of Civil Procedure 12(b)(7) permits the Court to dismiss a complaint for failure to join a party "whose presence is needed for a just adjudication." *HS Resources, Inc. v. Wingate*, 327 F.3d 432, 438 (5th Cir. 2003). Plaintiff alleges that he downloaded the Tinder app through iTunes and "provided Apple with his bank card number, through the iTunes store." (SAC ¶¶ 16, 68.) Plaintiff does not allege that either he or Apple provided his bank card information to Defendant. Also, while the SAC is unclear about which entity ultimately charged Plaintiff's bank card for his in-app purchases, it is clear that Apple was the merchant of record. Furthermore, after a consumer taps the initial "Get Plus" or "Get Unlimited Likes" button, every ensuing page in the subscription process occurs through the Apple App Store, rather than through the Tinder app, and every one of those pages (including the confirmation email) is controlled by Apple. (Tarkhanyan Decl., ¶ 13.)

Apple's presence is needed to adjudicate Plaintiff's claims under the EFTA and the APRS. Thus, in the event the Court denies Defendant's motion to dismiss Plaintiff's EFTA and APRS claims, Defendant requests that this Rule 12(b)(7) motion be treated as a motion to compel joinder of Apple as a defendant in this case (and if Apple is not joined, then to dismiss the EFTA and APRS claims). *See*

[13] There is no "minimum purchase obligation" other than the disclosed monthly fee itself. Thus, insofar § 17601(b)(5) applies, it was satisfied.

*Cunningham v. Municipality of Metro. Seattle*, 751 F. Supp. 885, 896-97 (W.D. Wash. 1990).

### D. Plaintiff Fails to State a Claim for Violation of the Unruh Act.

#### 1. The Unruh Act Does Not Apply Because Plaintiff Does Not Allege Any Unlawful Discrimination within California.

California's Unruh Civil Rights Act protects "[a]ll persons ***within the jurisdiction***" from certain identified forms of discrimination. Cal. Civ. Code § 51(b) (emphasis added). The Unruh Act, by its terms, is thus expressly limited to discrimination that takes place within California's jurisdiction. *Sousanis v. Northwest Airlines, Inc.*, 2000 WL 34015861, at *7 (N.D. Cal. Mar. 3, 2000); *see also Keum v. Virgin Am. Inc.*, 781 F. Supp. 2d 944, 955 (N.D. Cal. 2011) ("The Unruh Act only applies to discrimination that takes place within California's jurisdiction."); *Loving v. Princess Cruise Lines, Ltd.*, 2009 WL 7236419, at *8 (C.D. Cal. Mar. 5, 2009) ("It is well-settled that the Unruh Act applies only within California.").

The general presumption is that the California Legislature does "not intend[] California statutes to have force or operation beyond the boundaries of the state." *Sousanis*, 2000 WL 34015861, at *7. Here, the text of the Unruh Act is clear and explicit that the statute shall have no application to persons outside the state.

Plaintiff has resided in Florida at all times relevant to this case. (SAC ¶ 13.) He does not allege any unlawful discrimination while he was present in the state of California or that he has ever even visited the state. The only alleged connection to California is that Defendant "conducted business in the State of California" (SAC ¶ 14), which is an insufficient basis for a Florida resident who claims to have suffered unlawful discrimination in Florida to assert a claim under the Unruh Act.

The Unruh Act does not prohibit discrimination against individuals outside of California and does not apply to claims of non-residents allegedly harmed beyond

the state's borders. Therefore, Plaintiff does not have standing to enforce the statute and his Unruh Act claim should be dismissed.

**2. Pricing for Tinder Plus Does Not Violate the Unruh Act.**

Even if the Unruh Act applied extraterritorially, Plaintiff's claim would still fail. The Unruh Act "prohibits only arbitrary, invidious or unreasonable discrimination." *Sargoy v. Resolution Trust Corp.*, 8 Cal. App. 4th 1039, 1043 (1992) (affirming dismissal without leave to amend where complaint alleged bank offered higher interest rates to persons over age 55).

Age is not expressly identified as a protected category under the Unruh Act. Unlike the expressly protected classifications such as race and gender, there is "no general prohibition against all age-based discrimination or preferential treatment." *Pizarro v. Lamb's Players Theater*, 135 Cal. App. 4th 1171, 1175 (2006); *see also Starkman v. Mann Theatres Corp.*, 227 Cal. App. 3d 1491, 1499 (1991) (senior and child discounts permitted where pricing method takes into consideration budget constraints of groups receiving discounts).

Accordingly, age-based pricing differentials have consistently survived Unruh Act challenges. In *Pizzaro*, for example, a San Diego theater company provided discounted tickets to children and to adults born between 1946 and 1964—baby boomers, who were the subject of the musical that was being produced by the theater company at that time. 135 Cal. App. 4th at 1173. The court held that the age-based pricing did not violate the Unruh Act because it was reasonable and not arbitrary. *Id.* at 1176. The court reasoned that "[b]ecause a theater ticket discount allows greater access to the theater, public policy favors the disparate treatment, whether the discount is made available to children, seniors or 'baby-boomers.'" *Id.*; *see also Lazar v. Hertz Corp.*, 69 Cal. App. 4th 1494 (1999) (permitting age-based pricing for car rentals); *Starkman*, 227 Cal. App. 3d at 1499-1500 (noting numerous state and federal statutes providing benefits to persons based on age).

In fact, outside of the housing context, Defendant is unaware of any case in which a state or federal court in California has found an age-based distinction to violate the Act. Housing, of course, implicates important public policy concerns that simply are not at issue in a case involving access to premium features of a dating app. *See, e.g.*, *O'Connor v. Village Green Owners Assoc.*, 33 Cal. 3d 790, 794 (1983) (age restriction completely excluded families with children from certain neighborhoods). Moreover, unlike the housing cases, no one has been *excluded* from Tinder Plus. Plaintiff merely alleges that some people are charged less than others.

Age-based pricing also does not implicate the irrational stereotypes—such as those based on gender, race, sexual orientation, or disability—that the Unruh Act is intended to deter. *See, e.g., Starkman*, 227 Cal. App. 3d at 1499 ("Establishing different price rates for seniors and children in an amusement business does not perpetuate irrational stereotypes. . . . Such classifications recognize that without such incentives these populations may be totally excluded from enjoying some of the pleasures of our society."). Rather, the alleged age-based pricing for Tinder Plus applies to everyone equally. *See id.* ("unlike other classifications (e.g., race, sex, and national origin) all persons benefit from these discounts during their lifetimes, first as children then as senior citizens"); *see also Sargoy*, 8 Cal. App. 4th at 1045 (same).

Plaintiff's specific complaint is that offering a discounted price to consumers under the age of 30 is arbitrary. However, Plaintiff does not allege any basis for this conclusory assertion. *See Ashcroft v. Iqbal*, 556 U.S. at 681 (conclusory allegations not entitled to presumption of truth). This omission is especially significant given that price discounts based on age consistently have been found *not* to be arbitrary.

Moreover, the SAC itself contains an explanation for Defendant's pricing that refutes any notion that the alleged discrimination is arbitrary. The SAC quotes

a public statement by Defendant explaining that its pricing for Tinder Plus was "tested [] extensively" and "based on a combination of factors," and noting that younger users "are more budget constrained and need a lower price to pull the trigger." (SAC ¶ 79.) Providing a youth discount after extensive testing and in recognition of budgetary constraints faced by young people is the opposite of arbitrary. As established by *Pizarro* and *Starkman*, pricing that attempts to accommodate budgetary constraints of particular age groups does not violate the Unruh Act.

## IV. CONCLUSION

Defendant respectfully requests that the Court dismiss Plaintiff's Second Amended Complaint in its entirety. Because "the pleading could not possibly be cured by the allegation of other facts," Defendant also requests that the Court dismiss the complaint without leave to amend. *See Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 247 (9th Cir. 1990).

Dated: May 20, 2015 MANATT, PHELPS & PHILLIPS, LLP

By: /s/ Robert H. Platt
Robert H. Platt
Attorneys for *Defendant*
TINDER, INC.